IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DEPOT INVESTORS, LTD.,               )
                                     )
            Plaintiff,               )      TC-MD 150308D
                                     )
      v.                             )
                                     )
BENTON COUNTY ASSESSOR,              )
                                     )
            Defendant.               )      **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered February 18, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appeals the real market value of property identified as Accounts 122105, 116768, and 122113 (subject property) for the 2014–15 tax year. A trial was held in the Oregon Tax Courtroom on November 23, 2015, in Salem, Oregon. Hollis McMilan appeared on behalf of Plaintiff. Dean Rothenfluch (Rothenfluch) and Arthur Garnet "Gary" Pond (Pond) testified on behalf of Plaintiff. Richard Newkirk (Newkirk) appeared and testified on behalf of Defendant. Taryn Selvey (Selvey) testified on behalf of Defendant. Plaintiff's Exhibits 1 through 7 were received without objection. Defendant's Exhibits A, D, E, F, and H were received without objection. Defendant's Exhibits C and G were received over Plaintiff's objection. Defendant's Exhibit B was not received. This matter was tried concurrently with case TC-MD 150309D.

On November 19, 2015, Plaintiff filed an "unopposed emergency motion" to allow Terry Emmert (Emmert) to testify by telephone because he had injured himself in Mexico and was unable to attend trial. On November 20, 2015, Plaintiff filed its

Emergency Motion to Reschedule Trial, based on Emmert's unavailability. The court allowed Emmert to testify by phone; however, counsel for Plaintiff was unable to contact him. Under Tax Court Rule–Magistrate Division (TCR-MD) 8 B(3), the court denied Plaintiff's request to reschedule the trial because Emmert's testimony was not necessary to the presentation of Plaintiff's case, and because it was unknown how long Emmert would be unavailable.

## I. STATEMENT OF FACTS

The subject property was a one-story restaurant building with 6,016 square feet of gross building area on 0.9571 acre of land. (Def's Ex A at 7.) It had an approximately 330-square-foot outdoor dining area with a view of the Willamette River, and 54 asphalt parking spaces. (*Id.*) Plaintiff appealed from an Order of the Board of Property Tax Appeals (BOPTA) finding a total Real Market Value (RMV) of $1,331,591 for the subject property. Plaintiff alleged an RMV of $875,000. Defendant requests a total RMV of $1,430,000.

### A. *Plaintiff's Evidence*

Pond testified that he is a self-employed commercial real estate broker and a partner with Commercial Associates in Corvallis, Oregon. Pond testified that a previous lessee had informed him the subject property had been operating as a restaurant for many years and was vacant from mid-2012 through January 1, 2014. Pond testified that in March 2015, while representing the Old Spaghetti Factory (OSF), he viewed the subject property and observed that the restaurant equipment was outdated, a skylight had been leaking, the kitchen was filthy, and the premises lacked general maintenance. Pond submitted an offer on behalf of OSF to Plaintiff, which was accepted. (Test. of Pond.)

The ten year triple-net lease, renewable for four, five year terms, provided for rent payments of $5,000 per month plus six percent of all gross receipts which exceeded the basic rent. (Def Ex H.) The lease also provided for a 10 percent increase of the base rent every five years. (*Id.*) The lease terms obliged OSF to begin paying rent on the earlier occurring of the date the restaurant opened or 180 days after receiving all permits necessary to construct or operate a restaurant. (Def's Ex H at 3.) Pond testified that the rent abatement was in consideration of OSF removing outdated equipment from the subject property and making improvements costing almost $750,000. The lease was dated July of 2014; the day was left blank, and neither of Plaintiff's witnesses was able to recall the exact date of the lease or the date when OSF had obtained all necessary permits. (*Id.* at 14.) Pond testified that OSF opened for business at the end of November 2014.

On or about December 28, 2014, Pond prepared a letter documenting his valuation of the subject property. (Ptf's Ex 1.) Pond used an income capitalization approach to determine the value of the subject property. (*Id.* at 1.) Pond used the initial $5,000 basic monthly rent under the OSF lease to determine a gross rental income of $60,000 per year for the subject property. (*Id.* at 2.) Pond added the property tax reimbursement of $25,408 and then deducted five percent for vacancy and credit loss, which his letter asserted was an industry standard. (*Id.*) That figure resulted in a gross operating income of $81,138, from which Pond deducted $25,408 in real property taxes and $3,245 (four percent of gross operating income) for reserves and miscellaneous expenses, arriving at a net operating income of $52,485. (*Id.*) Pond applied capitalization rates of 6.00 and 6.25 percent because the high quality of the OSF tenant

made the risk of a default low. Using those capitalization rates, Pond determined the value of the subject property was between $840,000 and $875,000 respectively. Pond testified that if he had not known about the OSF lease, he probably would have used a higher capitalization rate, which would have resulted in a lower value. Pond testified that he had two reasons for not adding value for the additional percentage rent based on gross sales: first, he was not given any information about what OSF's actual sales were after it opened, and second, his analysis was prepared with insufficient time for stabilization. Pond testified that even if he had information about the additional percentage rent, he would not have added it to his analysis because the figures would be speculative.

Rothenfluch testified that he is a CPA for Plaintiff and that he prepared the K-1 statements for Plaintiff that were received into evidence as Exhibits 2 through 7. Rothenfluch testified that for several years after 2009—when Michael's Landing, a long-term renter, went out of business—the subject property generated sporadic rental income from a number of short-term tenants. A summary of the rents received for the subject property from 2009 through 2014 follows:[1]

| Year | Total Rent Received |
|------|---------------------|
| 2009 | None stated |
| 2010 | $ 20,200 |
| 2011 | $ 73,602 |
| 2012 | $ 12,585 |
| 2013 | $ - 0 - |
| 2014 | $ 7,000 |

///

///

---

[1] The information in this table is drawn from Plaintiff's exhibits 2 through 6.

B.      *Defendant's Evidence*

Newkirk testified that he is a commercial appraiser who has been employed by Defendant for approximately 13 years.  Newkirk prepared a written appraisal of the subject property using the comparable sales and income approaches.  (Def's Ex A.) Newkirk determined that the value of the subject property as of January 1, 2014, was $1,430,000.  (*Id*. at 3.)  Newkirk testified that the subject property consisted of three parcels of real property: one that includes the restaurant structure and two that are parking areas.  The building was originally the Corvallis Train Depot, and it was moved to its current location in 1982.  (Def's Ex G at 1.)  In that same year, an additional 2,730 square feet were added and the entire property was leased as a restaurant named Michael's Landing for almost 20 years.  (Def's Ex A at 9.)  Newkirk testified the subject property is zoned Central Business District, although it is situated on the waterfront.  He testified that the highest and best use for the subject property is as a restaurant.

Newkirk testified that he selected six properties for the comparable sales approach to value.  The first two comparable properties were restaurants in the Corvallis area. (Def's Ex A at 29–30.)  Comparable 1 was the sale of a property nine months after the appraisal date that had Sharis restaurant as a long-term tenant.  (*Id*. at 29.)  The property sold at $453.86 per square foot, and Newkirk testified that this sale represented the higher end of the comparable properties.  (*Id*.)  Comparable 2 was a 2010 sale of a restaurant, known as the Tokyo Steakhouse, for $175.10 per square foot.  (*Id*. at 20.)  Newkirk testified that the property had originally been a clothing store and had been converted to a "stylish restaurant."  (*Id*.)  That sale represented the lower end of comparable properties in Corvallis.  Comparable sales 3, 4, and 6 were located in the Salem area, and

comparable sale 5 was located in Eugene. (*See id*. at 31–34.) The unadjusted sales of the comparable properties ranged from $162.65 to $527.74 per square foot. (*Id*.) In addition to analyzing the sales on an overall price-per-square-foot basis, Newkirk performed a qualitative analysis in which he evaluated the comparable properties as inferior, superior, or similar to the subject property. (*Id*. at 36–39.) Newkirk valued the condition of sale of the subject property as "similar" to comparable 1 and 2. (*Id*. at 36.) Newkirk estimated that "the subject property valuation is likely to occur between $271 and $454 per square foot" and ultimately concluded that $300 per square foot was an appropriate value. (*Id*. at 39.) Using that figure, Newkirk came up with a gross value before adjustments of $1,800,000 (6,016 sq. ft. x $300, "rounded"). (*Id*. at 39.) Newkirk then adjusted that figure based on a vacancy of the property from January 1, 2014, through the end of June 2014, using the OSF rent figure of $5,000 per month. (*Id*.) Using a lost rent of $30,000 for the period, Newkirk applied a five percent vacancy factor, six percent expense ratio and 7.25 percent capitalization factor to arrive at a total negative adjustment of $370,000. Subtracting the adjustments from the initial indicated value of $1,800,000, Newkirk found a value of $1,430,000 using the sales comparison approach. (*Id*.)

For Defendant's income capitalization approach, Newkirk selected three properties, with comparables 1 and 2 being the same properties selected in the comparable sales analysis. (*Id*. at 44.) Comparable 1 had an annual rental rate of $32.10 per square foot on a triple net basis which represented the higher end of the properties. (*Id*.) Comparable 2 had an annual rental rate of $20.65 per square foot, on a triple net basis, which represented the lower end of the properties reviewed. (*Id*.) Comparable 3 was a fast food restaurant in the Corvallis area with a lease at $30 per square foot. (*Id*. at

43.) Newkirk testified that fast food restaurants tend to have a higher rent per square foot.

Using the three comparables, Newkirk determined that the average comparable rent was $27.58 per square foot, but for purposes of the analysis selected $24.00 per square foot. (*Id*. at 45.) With that estimate, Newkirk found an annual gross rent of $144,384, deducted five percent for vacancy, three percent for management, and two point five percent for reserves, leaving a Net Operating Income (NOI) of $129,621. (*Id*. at 45.) Next, Newkirk applied a 7.25 capitalization factor and obtained an indicated value of $1,787,872. (*Id*. at 45.) Just as he did for the sale comparison approach, Newkirk adjusted the value by $370,000 as a capitalized value of the lost rent and arrived at a real market value of $1,420,000. (*Id*.) Newkirk testified on cross-examination that his methodology for adjusting the value of the subject property using a lost rent figure of $5,000 per month was not methodologically supported.

## II. ANALYSIS

The issue before the court is the real market value of Plaintiff's property as of January 1, 2014. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev*., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[2] which reads:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

[2] References to the Oregon Revised Statutes (ORS) are to the 2013 edition.

The burden of proof is on the plaintiff to establish its claim by a preponderance of the evidence. ORS 305.427. "A preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev*, 4 OTR 302, 312 (1971)). To sustain the burden of proof in a property valuation case a party "must provide *competent* evidence of the RMV." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (citations omitted) (emphasis added). Such evidence includes "appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers." *Metzger v. Clatsop County Assessor*, TC-MD 120534D at 5 (Oct 30, 2012).

RMV is to be determined "in all cases" by "methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). The Department of Revenue has mandated the consideration of three approaches to real property valuation: the "sales comparison approach, cost approach, and income approach." OAR 150-308.205-(A)(2)(a). Not every approach will be applicable to every property. *Id.*; *see e.g*. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). The valuation approach or approaches to be used is "a question of fact to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979). Ultimately, the real market value of a property is a question of fact and the court is responsible for determining value. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted).

The first step in the valuation process is to determine the highest and best use of the subject property. OAR 150-308.205-(A)(2)(i). The parties agreed that the highest

and best use of the subject property, as improved, is the existing restaurant use. The court accepts their assessment on the highest and best use question.

The second step is to determine and apply the approach or approaches to value. Plaintiff utilized an income capitalization approach using only the existing OSF lease on the subject property. Plaintiff argued that the lease entered between two sophisticated parties, Plaintiff and OSF, just a few months after the valuation date, represented the best indication of value for the subject property. Plaintiff's approach does have some merit, in that the lease is fairly contemporaneous with the assessment date and did represent an arms-length transaction between two sophisticated market participants.

OAR 150-308.205-(A)(2)(g) provides that "[t]he income used in the income approach must be the economic rent that the property would most probably command in the open market as indicated by current rents being paid, and asked, for comparable space."

Plaintiff's income approach is based only on the existing lease, rather than on market leases. However, more troubling to the court is the fact that Plaintiff's appraisal method did not account for several factors that would be significant to a hypothetical buyer of the subject property. Those factors are the rental increases of ten percent every five years, the six percent overage based on gross sales, the significant investment by OSF in the building, and the rent abatement. To state the concern another way "practitioners who use direct capitalization must recognize that while an overall capitalization rate is only applied to one characteristic of the property, (i.e., to a single year's net operating income), the overall capitalization rate is valid only if it accounts for all other characteristics of the property." Appraisal Institute, *The Appraisal of Real*

*Estate*, at 461 (14th ed 2013). Plaintiff's appraisal did not account for all of the factors which are part of the OSF lease. Plaintiff's argument that those figures are speculative does not mean they should be ignored. To do so renders the appraisal artificially low. It is impossible from the evidence presented to determine an appropriate adjustment to the figures, and thus the court is unable to determine a value of the subject property as of the assessment date using Plaintiff's evidence. The court finds that Plaintiff has failed to meet its burden of proof.

Even though the burden has not shifted under ORS 305.427, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Defendant asserts a total real market value of the subject property that is higher than that found by BOPTA. Defendant used two methodologies to determine value of the property; the sales comparison and income capitalization approach.

With regard to Defendant's sales comparison approach, Defendant failed to make appropriate adjustments for the condition of the subject property for which the tenant expended $750,000 in improvements and for which the Plaintiff gave rental concessions of up to $30,000. Defendant's comparable properties 1 and 2 were in pristine condition with long term tenants whereas the subject property was in need of significant updating, repairs, had a long period of sporadic rental income, and was vacant as of the assessment date. Defendant's evidence provides no guidance on the effect of the properties' condition and rental history on its real market value. As a result, the court concludes that Defendant overestimated the value of the property.

/ / /

With regard to Defendant's income approach, Defendant conceded on cross-examination that the discounts applied to reduce the value for "lost rent" were methodologically unsupported. The court is unable to rely on Defendant's evidence in determining value of the subject property.

## III.  CONCLUSION

The court has carefully evaluated the evidence and testimony in light of applicable law (including appraisal methodology therein) and concludes that Plaintiff failed to meet its burden of proof. The evidence presented is inconclusive and the court is unable to determine the 2014-15 real property value of the subject property. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of March 2016.


RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on March 14, 2016.*